IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| In re: } | | |
| } | | |
| **Benjamin Alan Beatty,** } | Case No. 17-41008-JJR | |
| } | Chapter 11 | |
| Debtor. } | | |

| | | |
|---|---|---|
| In re: } | | |
| } | | |
| **Ben Beatty Custom Homes, LLC** } | Case No. 17-41009-JJR | |
| } | Chapter 11 | |
| Debtor. } | | |

**OPINION AND ORDER**

I – Parties and Objections to Creditors' Claims

On May 31, 2017, Benjamin Alan Beatty ("BAB") and the limited liability company through which he operated a home construction business, Ben Beatty Custom Homes, LLC ("Homes" and together with BAB, the "Debtors"), each filed a petition for relief under chapter 11 of the Bankruptcy Code (11 U.S.C. § 101, *et seq.*, and herein the "Code"). BAB and Homes have filed proposed plans to reorganize, but before those plans may be considered for confirmation, the court must rule on the Debtors' objections to claims filed by creditors, Tony Barnwell ("Barnwell"), and David and Shannon Coker (the "Cokers" and together with Barnwell, the "Creditors"). Barnwell filed a claim in each case for $15,040 (claim #6-1 in Homes' case, and claim #8-1 in BAB's case). Likewise, the Cokers filed claims in each case for $128,485.16 (claim #5-1, -2, -3 in Homes' case, and claim #7-1, -2 in BAB's case). The court conducted an evidentiary hearing on the Debtors' objections to the Creditors' claims on April 5, 2018.

## II - Jurisdiction

The court has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama. Title 28 U.S.C. § 157(b)(1) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . " and § 157(b)(2)(B) specifically states that core proceedings include the "allowance or disallowance of claims against the estate . . . ." The matters covered by this opinion and order are contested matters under Rule 9014 of the Federal Rules of Bankruptcy Procedure, and the parties have appeared at length before the court on these matters, and have thereby consented to the court's full adjudication thereof. Thus, the court may enter a final order in these matters.

## III – Breach of Construction Contracts

The Creditors alleged that Homes breached the Construction Contracts it entered into with each of them.[1] In essence, they assert that Homes failed to complete the construction of their respective residences as required by the contracts, and that the incomplete construction was not performed in a workmanlike manner. The Creditors alleged that due to Homes' breach, they were required to expend substantial sums to finish the construction and repair the deficiencies in the partial work performed by Homes. Notably, there was no evidence offered by any party that compared the projected values of the residences if they had been completed as required by the Construction Contracts with their values as actually completed with all the alleged defects and deficiencies.

---

[1] Coker's contract was admitted into evidence as Debtor's Exhibit 5 and Barnwell's contract was admitted into evidence as Debtor's Exhibit 4.

## IV – Piercing the Veil

The Construction Contracts between the respective Creditors and Homes identified Homes as an "Alabama Limited Liability Corporation."[2] There was nothing in the contracts that indicated BAB guaranteed or otherwise would be personally liable for Homes' obligations under the contracts. Counsel for the Creditors argued that Homes was obviously under-capitalized as evidenced by its bankruptcy and failure to complete construction of the Creditors' residences, as well as its failure to pay subcontractors and maintain its state license (discussed *infra*). But under capitalization, in and of itself, is not sufficient to "pierce the veil" and hold the principals of a limited liability company ("LLC") or a corporation personally liable for the defaults of the LLC or corporation. If that were the case, the principals of every LLC and corporation that filed for bankruptcy relief would, *ipso facto*, be held jointly liable for debts of the LLC and corporation. There was no evidence that BAB operated Homes for a fraudulent purpose, misused Homes as his alter ego, or that he wrongfully appropriated its assets, most notably its cash, to his personal use. To the contrary, BAB testified that he observed the formalities needed to keep his finances separate from those of Homes, and the evidence revealed that BAB's income as an employee of Homes was modest. Additionally, there was no evidence that challenged the formation and good-standing of Homes' as an LLC or corporation. Thus, the court finds that the evidence does not support holding BAB personally liable for the obligations of Homes under a veil-piercing theory. Unlike

---

[2] The signature blocks at the end of the contracts are signed by BAB as the "Member/Manager" of Homes, indicating that Homes is not a corporation, as stated in the first paragraph of the contracts, but rather a limited liability company. Regardless, both entities provide similar insulation from personal liability for their principals, whether it be shareholders in a corporation or members of a limited liability company. Regardless, that discrepancy—LLC vs. corporation—was not raised by either of the Creditors, and that in and of itself would not have changed the court's decision.

Barnwell, the Cokers' claim against BAB rests totally on piercing the protective veil of Homes. Thus, the Cokers' claim against BAB will be disallowed in its entirety.

### V – Builder's License

BAB testified that Homes was not licensed by the state of Alabama as a residential home builder. He stated that he relied on his wife to maintain Homes' license and keep it current with the Alabama Home Builders Licensure Board (the "Licensure Board"), but, unbeknownst to him, she failed to renew the license for the year 2017, which was the year the Creditors contracted with Homes. According to the testimony of James R. "Chip" Carden, Executive Director of the Licensure Board, if Homes had been licensed, the Creditors could have each recovered their losses of up to $20,000 from the Homeowner's Recovery Fund (established pursuant to Alabama Code 1975 § 34-14A-15). But, because Homes was not licensed, the fund was not available to the Creditors.

David Coker and Tony Barnwell both testified that had they known Homes was not a licensed homebuilder, they would not have contracted with Homes to build their residences. To his credit, Mr. Coker candidly admitted that he never asked BAB whether Homes was licensed, and that BAB never told him Homes was licensed. Thus, there was no misrepresentation by BAB to the Cokers regarding the licensure status of Homes. However, Mr. Barnwell testified that he specifically asked BAB whether Homes was licensed, and, BAB, who mistakenly believed his wife had renewed the license, told Barnwell that Homes was in fact licensed with the state. That statement was not true.[3] If BAB's representation to Barnwell regarding Homes' license had been

---

[3] The court explicitly finds that BAB's misrepresentation to Mr. Barnwell was an innocent mistake and was not done with the intent to deceive. Thus, the facts would not support a nondischargeability finding under Bankruptcy Code § 523(a).

4

accurate, Barnwell would have been entitled to claim up to $20,000 against the Homeowner's Recovery Fund.

## VI – Misrepresentation

Alabama Code 1975 § 6-5-101 states, in pertinent part, that "[m]isrepresentations of a material fact . . . made by mistake and innocently and acted on by the opposite party, constitute legal fraud."  Thus, under Alabama law, even when made by mistake or innocently, an untrue statement entitles the party who relies thereon, to his detriment, to recover compensatory damages for his loss.  *Hall Motor Co. v. Furman*, 285 Ala. 499, 234 So. 2d 37 (Ala. 1970).  BAB's representation to Barnwell that Homes was licensed—even though BAB mistakenly believed his wife had renewed the license—was untrue, and Barnwell relied on that misrepresentation to his detriment.  According to Barnwell's testimony, he would not have contracted with Homes had he known it was not licensed.  Had BAB's statement that Homes was licensed been true, Barnwell would be entitled to recover his loss, up to $20,000, from the Homeowner's Recovery Fund, assuming, of course, that Barnwell suffered a loss as a consequence of Homes' breach of the Barnwell Construction Contract.  As discussed below, the court concludes that Barnwell did not suffer any recoverable loss as a result of Homes' failure to complete construction of his residence; hence, it was of no consequence that Barnwell was not eligible to file a claim against the Homeowner's Recovery Fund.

## VII – Damages

At end of the evidentiary hearing, the court requested that the parties each submit an accounting of what they claimed was owing by Homes on the two Construction Contracts after all appropriate credits and debits.  All parties complied with the court's request.  It would have been helpful if their accountings had been explained through testimony or attorneys' arguments at the

5

hearing, or by a written narratives included with the post-hearing submissions. Nonetheless, the court reached its decision in these matters by considering the testimony and evidence received at the hearing, and carefully reviewing the two Construction Contracts (including the itemizations of work attached thereto), the proofs of claim and objections thereto, along with the parties' post-hearing submissions

   A. Barnwell's Claim:

Per the Construction Contract, Barnwell agreed to pay $192,600 for Homes to build Barnwell's house according to certain plans and specifications, neither of which was offered into evidence. However, attached to the contract was a "list of work to be completed" which included a basic itemization of the labor and materials Homes agreed to provide, including dollar allowances for certain line items.

According to Homes' post-hearing submission (Doc. 120), the construction draws Barnwell paid totaled $146,600, leaving an unpaid balance of $46,600 due under the contract if it had been fully performed. But construction of the house was not completed, and according to Barnwell, he paid $15,040 to complete the construction, including the cost to repair defective work. (Doc. 115.) Homes claims that it performed extra work totaling $7,201 for a concrete pad and is due credit for that amount. (Doc. 120.) The court agrees with Homes; the concrete pad was not included in the itemization of work attached to Barnwell's contract.

Although the court agrees with Barnwell that he had to spend an additional $15,040 to complete the construction, he did not take into account that he would have owed Homes an additional $46,600 if Homes had completed construction, plus $7,201.02 for the extra concrete

6

pad. Thus, not accounting for the extra concrete pad, Barnwell saved $31,560 by completing construction himself.[4]

Barnwell testified that the overall quality of the construction was inferior and identified several deficiencies. But there was no evidence comparing the value of Barnwell's house as finally completed, with what its value would have been if it had been completed in a workman like manner in compliance with the contract. Thus, based on the evidence before the court, the only issue the court may decide is how much of Barnwell's $15,040 claims should be allowed in each case. The answer is simple: none. Not only is Homes due a credit of $7,201 for the cost of the extra concrete pad, the balance of Barnwell's claims is more than offset by the amount Barnwell saved by completing the construction himself and not paying the balance due on the Construction Contract.

B. The Cokers' Claim:

Per the Construction Contract, the Cokers agreed to pay $373,144 for Homes to build their house according to certain plans and specifications, neither of which was offered into evidence. However, attached to the contract was a "list of work to be completed" which included a basic itemization of labor and materials Homes agreed to provide, including dollar allowances for certain line items.

According to Homes' post-hearing submission (Doc. 119), the Cokers paid construction draws totaling $314,914 plus they were entitled to a credit of $15,000 for "direct payment for cabinets," leaving an unpaid balance of $43,230 due under the contract if it had been fully performed. But construction of the house was not completed, and according to the Cokers, they paid $111,033 to complete the construction, plus because of the delay in completing construction

---

[4] $46,600 unpaid balance due on the Construction Contract, less $15,040 to complete construction and make repairs.

due to Homes' breach, they incurred additional construction loan interest totaling $17,452. (Doc. 114.) On the other hand, Homes claims it performed extra work totaling $27,158 for which it is due a credit. (Doc. 119.)

In the itemization attached to the Cokers' contract, the first line item, "excavation work," provided for, "no driveway work." Thus, Homes is due a credit of $3,450 it claimed as extra work for "excavation: driveway and gravel topping." For the same reason, the $4,500 the Cokers claimed for "Scott Johnson chert driveway" is disallowed as a cost of completion.[5]

Homes also claims $2,500 for "50 *extra* recess lights" at $50 each. An invoice Homes attached to its post-hearing submission was for 80 recessed lights; the contract called for 30 recessed lights. Thus, Homes is entitled to a $2,500 credit for the extra lights.

Homes seeks a credit of $5,294 for an upgrade to lifetime roofing. The itemization attached to the contract specified "35 year shingle [sic]." Thus Homes is due credit for the roofing upgrade. Similarly, Homes seeks a credit of $11,809 for an upgrade from vinyl windows and steel doors specified under the contract, to wood/metal clad windows and fiberglass doors. The credit is supported by invoices attached to Homes' post-trial submission (Doc. 119) and is due to be allowed.

The Cokers' itemization of their expenses to complete construction included $1,000 for topsoil. Landscaping under the contract included only "grass seed and hay pine straw flower beds add 10 shrubs [sic]." Thus, the expense for topsoil should not be allowed.

---

[5] The Cokers' contract called for a "concrete driveway and walk ways 30 yard estimate[sic]." The contract excluded the excavation work required for the driveway, but allowed for concrete. It did not mention chert or gravel.

8

And finally, the Cokers' contract estimated a completion date of September 8, 2016, and thus the additional construction loan interest they incurred, totaling $17,452, was a foreseeable loss caused by Homes' failure to timely complete construction.

The Coker's claim against Homes totals $128,485 ($111,033 to complete construction plus $17,452 additional construction loan interest). However, by completing construction themselves, the Cokers saved the $43,230 that remained owing on the Construction Contract, and Homes is due a credit for that amount, thereby reducing the Cokers' claim to $85,255. The court concluded that the $4,500 and $1,000 the Cokers claimed for the chert driveway and topsoil, respectively, were not included under the contract, and should be disallowed, thus reducing their claim to $79,755. Finally, the court concluded that Homes was entitled to credit for the following extras: $3,450 for driveway excavation and gravel; $2,500 for additional recessed lights; $5,294 for the lifetime roofing; and $11,809 for the upgraded windows and doors. Those credits total $23,053 and reduce the Cokers' claim to $56,702.[6]

---

[6] The court is mindful that Barnwell and the Cokers suffered mental anguish caused by Homes' failure to timely construct their residences in a workmanlike manner, and otherwise comply with the Construction Contracts, and there are likely defects in Homes' work that were not accounted for in the court's calculation of the Creditors' claims. However, the court cannot allow claims based on unquantified, ethereal losses or resort to guesswork in assigning a dollar amount to allowed claims. Evidence that would have compared the values of the houses as they should have been built under the contracts, with their actual values as finally completed by the Creditors, might have added to the amounts allowed on the Creditors' claims, but the court did not have the benefit of such evidence. Nonetheless, the court is aware that the expenses of hiring professional appraisers and construction experts, compared with the likelihood of recovering, in cash, any increase in damages they might have been proven, may have been an economic risk not worth taking, especially in light of the bad experiences the Creditors already endured.

## VIII - Order

Based upon the foregoing, it is hereby ORDERED that:

(1) Claim #6-1 in the amount $15,040.00 filed by Creditor Tony Barnwell in the case of Ben Beatty Custom Homes, LLC, case no.17-41009, is DISALLOWED in its entirety and the Debtor's objection thereto (Doc. 58) is SUSTAINED.

(2) Claim #8-1 in the amount $15,040.00 filed by Creditor Tony Barnwell in the case of Benjamin Alan Beatty, case no.17-41008, is DISALLOWED in its entirety and the Debtor's objection thereto (Doc. 87) is SUSTAINED.

(3) Claim #5-1, -2, -3 in the amount $128,485.16 filed by Creditors David and Shannon Coker in the case of Ben Beatty Custom Homes, LLC, case no.17-41009, is ALLOWED in the amount of $56,702 and the Debtor's objection thereto (Doc. 68) is OVERRULED to the extent said claim is allowed.

(4) Claim #7-1, -2 in the amount $128,485.16 filed by Creditors David and Shannon Coker in the case of Benjamin Alan Beatty, case no.17-41008, is DISALLOWED in its entirety and the Debtor's objection thereto (Doc. 86) is SUSTAINED.

So done and ordered this 25th day of April 2018.

/s/ James J. Robinson
JAMES J. ROBINSON
CHIEF U.S. BANKRUPTCY JUDGE